Good morning, your honors. I may please the court. I'm here with my client, Wendy Thompson, today. Wendy Thompson was a valued employee at Kanabec County for 25 years, serving as its Director of Public Health and later as Director of Health and Human Services. After being forced into early retirement in December 2016, she brought claims against both her former employer as well as neighboring Mille Lacs County. This appeal, of course, follows the dismissal of Thompson's complaint at summary judgment and the entrance of a cost judgment in Kanabec County's favor. As we provided in the briefing, Thompson seeks reversal of several decisions below, and we believe each of these issues merits the court's attention. However, I intend to focus my argument this morning on why the court must reverse the claims under the Federal Family and Medical Leave Act. Thompson asserts two types of claims under the FMLA, an interference claim and a retaliation claim. FMLA interference does not, of course, require proof of retaliatory intent or any intent at all. All that a plaintiff must do is show that she was entitled to a benefit under the FMLA, and that benefit was not turned on whether there was interference. It's undisputed in this case that Ms. Thompson requested FMLA leave on November 21, 2016. In response to that request, the county coordinator and County Commissioner Patrick Christofferson, who was in charge of FMLA decisions, essentially ignored her request, did not issue the paperwork that he normally does when employees request FMLA leave, does not designate any FMLA leave. Counsel, where's the prejudice from the failure to advise there, though? I mean, your client was already on leave, and my understanding is the benefit she would have been allowed is to take immediate leave and exhaust that prior to FMLA benefit. So I'm struggling a little bit with where the prejudice is. Sure. And that is one of the reasons that the district court ultimately dismissed my client's claim. However, there is prejudice here. Yes, she was on leave already. She was on administrative leave and using her PTO at the time. So we're not claiming that she has lost any PTO as a result of his failure to issue notice. However, Thompson was required throughout what should have been designated as FMLA leave to participate in a mandatory investigation. This required, at a time when she was medicated and at times could not walk, this required her to communicate about issues that involve both intensely personal and intensely professional matters. So is the argument that the company or the county was obligated to freeze its investigation until the termination of her leave? No, Your Honor. The obligation was for the county to offer the same benefit that it had promised Thompson before she requested leave. Namely, that she would have a chance to present her case and defend herself in front of the board before the board would consider termination. It's the unanimous testimony of all of the witnesses for Connecticut County that that is what they were going to do before they considered termination. The board chair, Gene Anderson, testifies repeatedly that he intended to have her present in front of the board before they were going to make any decisions regarding Wendy Thompson's employment. Patrick Christofferson testified similarly. So did Les Nielsen. The record is undisputed, Your Honor, is that Thompson was promised this benefit of being able to present in front of the board before there was any consideration of her termination. And she was not afforded that opportunity in the end, expressly because, as we know from Patrick Christofferson's email correspondence in mid-December, expressly because the FMLA request that Thompson submitted was the last straw. This is all from Connecticut County's own witnesses, all from Connecticut County's own documentation. So back to the idea of prejudice, it's hard to imagine a circumstance where more could be on the line from Wendy Thompson. She was forced in mid-December to have to choose between following her doctor's orders and taking time to recover pursuant to the four-week leave and taking time to respond to multiple requests from Patrick Christofferson to put together and prepared for a presentation to make very important decisions about the fate of her employment at Kennebec County. This is precisely, precisely what the FMLA sought out to avoid. Now, regarding the interference claim, the other finding the court made with respect to Thompson's FMLA interference claim was that the tasks, the participation, the multiple tasks they required to participate in the investigation were de minimis light-duty tasks. If we look at the FMLA, there are no exceptions for de minimis or light-duty tasks. The FMLA provides an eligible employee 12 work weeks per year per 12 months and prohibits an employer from interfering with that leave. There are no exceptions to that in the statute. Now, there is a mention of returning to an, the possibility of returning an employee to a part-time position that's medically necessary. If you look at 2614b1, that part of the statute says leave due to a serious health condition may be taken intermittently or on a reduced schedule leave when medically necessary. The other place in the statute that, that is germane to this issue potentially is, is the statute that's the part of the, the construction part of the statute that 2617a5, which says, quote, nothing in this subsection shall be construed to prohibit an employer from requiring an employee on leave under section 2612 of this title to report periodically to the employer on the status and intention of the employee to return to work. So the statute potentially lays out two exceptions to an employer being prohibited from interfering with leave. That there's medically necessary return to work in a part-time position and that they're contacting the employee for the status and intention of the employee to return to work. Neither of these exceptions applies here. Kennebec County did not even put her on FMLA leave, did not designate FMLA leave. Nobody was acknowledging that she was on FMLA leave and in fact, Chris Sofferson was taking great pains not to inform the board of this fact. He was definitely not checking in on Thompson to see if she could return to work. Likewise, there was no discussion of a light-duty assignment. Her doctor's note said she needed four weeks leave. It never, she was never authorized to return to part-time work or light-duty work. Now the district court relies on a couple of regulations, but these regulations don't expand upon those two exceptions. 29 CFR 825702 addresses a situation where a medical professional has returned an employee to work in a light-duty position. And it discusses how, and it discusses the interplay with the worker's compensation statute in such a situation. Counsel, did those tasks that were assigned relate to work duties or to the investigation that was being conducted? Well, presumably the investigation was related to her work duties at Kennebec County. Now of course we have claims in this case that they were motivated by marital status and other discriminatory factors, but Kennebec County's position is that they were considering what to do with Thompson's employment as its Director of Health and Human Services. Would you agree that an FMLA claim can't be used as a shield against otherwise lawful employment actions of an employer? I would agree that that's true. However, the same, along the same lines, an employer cannot use FMLA leave as a negative factor in That's why I asked the question about the nature of the tasks, because were they interfering with the FMLA leave or were they simply conducting an investigation into an otherwise legitimate employment investigation? Even assuming if they were investigating into a legitimate employment investigation. The FMLA does not permit interference with the require the employer to make requirements of the employee while they're on leave. That's the whole point of protective leave. That goes to Judge Kovas' question about whether the employer would be required to basically put their investigation on hold once the FMLA claim was made. Well, no, Your Honor. This goes to the narrative that both the District Court and the Kennebec County often repeat, which is that the employer was on this course before the FMLA leave on its investigation and didn't veer from that course after the FMLA request. That's manifestly untrue if you look at the record. The Kennebec County was intending to have Thompson present in front of the board and they were going to delay a decision about her employment until she presented on the board. The exact time that changed was on December 15th when Patrick Christofferson received and reviewed Thompson's medical notes stating that, reiterating that she had to take four weeks leave. He wrote that that was the last straw. That was the last straw that would force him to, that would untie his hands from the previous board directive that she was to present in front of the board. Counsel, you can address this either now or on rebuttal, but I'd like you to address whether he was a decision-maker for purposes of our analysis. Yes, Your Honor. He was a decision-maker. It's undisputed. He testified he was a decision-maker regarding the FMLA leave. He was the decision-maker regarding decisions regarding the board meeting, December 16th into December 20th, which became the December 21st board meeting. He was angling to become the ultimate decision-maker regarding Thompson's employment, but that's neither here nor there because it's clear under United States Supreme Court precedent that he does not need to be the ultimate decision-maker. He can have retaliatory animus and proximately cause the adverse employment action without being the ultimate decision-maker and the employer can still be held liable under the stop Supreme Court case. Am I right in understanding that what your decision-maker argument is essentially that he played a gatekeeping function on her ability to present to the county board? He did do that, Your Honor, and he also was advising and driving the decision regarding when and what the employment, the termination-slash-resignation outcome would be for Thompson. So it's both a gatekeeping function and intimately involved in the decision-making process argument. Yes, Your Honor, and I'd argue that he was the actual decision-maker for many of the key decisions at issue here. I'll reserve the remainder of my time for rebuttal. Thank you. Thank you. Is it Kelberg Nelson? Kelberg. Kelberg, I'm sorry. Yeah, you know, my grandmother would be very disappointed. May it please the court and counsel, my name is Callie Kelberg Nelson. I represent Connecticut County in this matter. Summary judgment should be affirmed in this matter because the dismissal of Wendy Thompson's FMLA claims, the state law claims, and the award of costs to Connecticut County were all proper. Connecticut County did not interfere with Wendy Thompson's FMLA rights because it was entitled to address the employment misconduct that predated her FMLA request. And that started on October 4th when she was put on leave because she was under investigation with child protection in Mille Lacs. The FMLA issues changed the course of the investigation, that the county changed in fundamental ways how they conducted the investigation, depriving the plaintiff here of some of her rights that she was promised prior to the FMLA. Sure, and I think Thornberry goes to the fact that even if someone would be on FMLA leave, you still can address conduct that would entitle the employer to discharge that employee. If we look at the exact timeline of events, you'll see that Connecticut County did not change course at all because of the FMLA request. And even Ms. Thompson's own testimony recognizes she knew termination was a possibility well before her FMLA leave request. It certainly does indicate that, but the question is, does it indicate that she understood that, or did the county change their position on her ability to make a personal presentation to the board because of her medical inability to appear, right? No, that wasn't changed at all, and that's governed by the Minnesota Data Practices Act under Chapter 13. That governs when they can have closed sessions, and what the record shows is that Ms. Thompson wanted to appear with her attorney in a closed session, which would not be allowed under the Data Practices Act. And so that would be the only reason she was prevented in any way, not related to her FMLA request, but that she was limited in how she could present. She would have to present in an open meeting, and that was something maybe she did not want to do. But if we look at the exact timeline, on December 7th, that's when Ms. Thompson advised Coordinator Christofferson that she had received the maltreatment determination. She didn't tell him exactly what was in that report, but he understood she was appealing it, so it obviously was not good for Ms. Thompson. So it was at that point they got off the phone, Coordinator Christofferson goes to the county board meeting, and they decide December 16th we're going to address this issue. On December 13th or 14th, that's when Ms. Thompson leaves the doctor's note on Mr. Christofferson's desk. And then that's when we have the December 15th email where he says he's fed up. The meeting had already been scheduled with the county board to address this maltreatment determination. So the FMLA leave request, while County Coordinator Christofferson may have been fed up, he was not a decision maker. And I think there's been a claim that it's undisputed he was a decision maker, and he absolutely was not. Ms. Thompson recognized that the county board was the only people who could terminate her. And what is really important, and this goes to the retaliation claim, is that there was no decision made on her employment. On December 21st, the county board was set to meet to discuss what to happen. And termination was an option. There were also other options that were going to be considered. But on December 20th, Ms. Thompson resigned or retired. And that prevented the county board from ever making a decision. Because of that, there's no adverse employment action. And that would be fatal to the retaliation claims because we have no adverse employment action. I do want to go back even further to recognize that Ms. Thompson knew termination was on the line well, well, well before any FMLA leave request. I do also want to note that the investigation interview occurred in October. And so that was before any FMLA request. So the claim that she had to do all of these tasks on her supposed FMLA leave would not be accurate. She performed absolutely no work. She was directed on October 4th not to do any work for the county. And there is no work she did conduct for the county during any of this time she was on leave. So I want to go back to on November 9th, Ms. Thompson said she discovered that she needed medical care. And she testified, and this is at the joint appendix 330. I had no idea of any of the outcomes of what Kanabec County was doing. And so I was concerned that I would lose my medical coverage. Then she goes on and says when she went to the doctor on November 18th, she found out she needed to have surgery. And this is what she testified at the appendix 331. Oh my gosh, I need to have surgery, like right away. And I don't even know if I'm going to have coverage next month because I don't know if I'm going to have my job. And I point that out because it's really important because on November 21st is when she actually puts in her FMLA leave request or notifies county coordinator Chris Sofferson that she's going to need surgery sometime in the future. And I point that out because it is entirely inaccurate to say that suddenly the county had decided they were going to terminate her. That was on the table well before this FMLA leave request. And so it's inaccurate to say that suddenly on December 13th or 14th, county coordinator Chris Sofferson somehow had a change and was incensed and decided he wanted to terminate her. Even if that's true that he wanted to terminate her, he didn't have the power to terminate her. It required a majority vote of the county board. And so for those reasons, that would be, she would not be able to establish her interference claim. I want to address the tasks that she claimed she did while she was supposed to be on FMLA leave. As I noted before, she performed no work for the county. She was also, what she did do was voluntary. She would call coordinator Chris Sofferson to ask questions and provide updates on whether she had her child protection investigation report. She voluntarily went to a commissioner's house on December 4th. She voluntarily wrote the letter to the county commissioners on December 20th. And she repeatedly called coordinator Chris Sofferson. That's in her testimony and in her complaint that she repeatedly would call coordinator Chris Sofferson. There was absolutely no request that she make those contacts. She did all of those voluntarily. So this can also be distinguished from the Massey-Diaz case where the person is actually doing daily work. She was a physician's assistant checking on patient files and filling prescriptions. It's totally unlike that. And even in that case, the court found that that was voluntary and uncoerced work while the person was on FMLA leave. Kanabec County was entitled to address the child protection report and its impact on Ms. Thompson's work. As the director of Health and Human Services, that maltreatment determination was particularly important to Kanabec County. And they were entitled to address that. On the retaliation claim, I do want to address, as I mentioned before, there's no adverse employment action. There's been a claim that there's somehow a cat's paw theory of liability that can be successful here. Given the fact that Chris Sofferson was not a decision maker and the fact that no decision was made, we don't get to that the same reasoning in Staub where there was actually. Let's look at that just a little bit further. Let's suppose, for sake of argument, that Chris Sofferson was a decision maker. Isn't his last straw comment a big problem for you? Well, I think it's really hard in a county board organization to say that he could be a decision maker. If we say he's a decision maker and just his decision to not give her FMLA is enough, that would be strict liability. And in Thornberry, the court has already decided that there's no strict liability in just the denial of FMLA alone. You're relying on the no adverse employment action. Correct, yes. So there was actually no decision made by the county board. Really, I mean, the only thing that Ms. Thompson knew was on December 4th, Commissioner Nielsen testified he didn't know how he was going to vote, but that he would probably follow the attorney's recommendation, which was for termination. So she knew she maybe had one vote in favor, but there needed to be two more. And she never kind of let that process play out. And whether Chris Sofferson wanted to terminate her or not, that still would have to go to a vote to the county board in order to give him that authority in order to terminate her. So he never had that authority. What's clear from his email is that he was hoping the county board would give him that authority, but it never happened because they never held another meeting where Ms. Thompson's employment was discussed other than to accept her retirement. What if the board was just kind of a rubber stamp for his decisions? Well, we don't have that kind of evidence in the record. But, you know, he was a counsel to the county board, but we don't have any evidence that he did. In fact, on November 2nd when the county board met, the attorneys recommended termination, and the county board decided to hold off and wait until the child protection report was received. So it's actually not showing that they were just kind of a rubber stamp to being told what to do in those instances. Then finally on the retaliation claim, there's this claim of constructive discharge to address. First, Ms. Thompson was out on leave since October 4th, so she cannot claim that there were any intolerable work conditions that made her feel like she had to quit. She certainly had other options. She was told repeatedly that termination was not her only option. On December 7th in her complaint in paragraph 52, and this is the joint appendix 11, that she was told on December 7th by Coordinator Christofferson that resignation and termination were not her only options. On December 20th, she submitted her letter to the county commissioners asking for a leave of absence while she appealed the maltreatment determination. And even the day before she submitted her resignation, Ms. Thompson was specifically told through her in the letter she was sent advising of the December 21st meeting that in the event the board does not take action to terminate your employment, so that was also a possibility that termination would not occur and her FMLA would be processed. So simply being told that termination is an option that may be considered is not grounds for a constructive discharge. If that was true, then back on before the November 2nd meeting, constructive discharge would have occurred because it would have been intolerable for her to even have the consideration of termination hanging over her. This standard would basically result in every employee who's told that termination may result would have a constructive discharge claim. There must be something actually intolerable about the working conditions, otherwise just having an upcoming meeting where her employment will be discussed would be insufficient. Because there was no adverse employment action, then the FMLA retaliation claim, also the summary judgment was proper and should be affirmed. Finally, I will just say the dismissal of the state law claims was also proper because of the FMLA dismissal and the award of costs to Connecticut County was also proper because we were the prevailing party. Thank you. Thank you. Ms. Olson, when you're ready. Thank you. Your honors and counsel, may it please the court. My name is Kendra Olson and I'm here today representing Millac County, which has a very limited and clear position in this case. Millac County is asking this court to affirm the district court's decision not to exercise supplemental jurisdiction over the remaining state law claims after it awarded summary judgment to Connecticut County. It was not entirely clear from appellant's statement of the issues to be reviewed in this case whether or not appellant was prepared to concede that if this court were to affirm the district court's grant of summary judgment with respect to Kennebec's FMLA claim that it was also proper for the district court to decline to exercise jurisdiction. This case fits squarely into 28 U.S.C. 1367 C.3, which delineates that a district court, once it has either decided or dismissed all claims that are offering original jurisdiction, that the court may decline to exercise supplemental jurisdiction at that time, and that is exactly what happened in this case. I'd also like to very briefly address appellant's request to strike Millac County's statement of the case in this matter. If appellant's position were applied consistently, then appellant herself would also need to have her statement of the case amended to remove all references to Millac County's actions and participation in this case. Those details are appropriately considered by this court because they are pertinent to the state law claims, which the court declined to exercise jurisdiction over. So, Your Honors, the district court's decision is afforded an abuse of discretion standard of review. Under this broad latitude, Millac County respectfully asks this court to affirm the court's decision. Thank you. Thank you. Thank you. Kinnebet County continues to argue that these requirements made of Wendy Thompson during her FMLA leave were voluntary. To find that they were voluntary, you'd have to ignore the following evidence. Kinnebet County, in its own brief, said, quote, for any of the activities Thompson engaged in while on administrative leave and after her request for FMLA leave, the activities were necessary and a part of the employment investigation. You'd have to ignore Thompson's unrebutted testimony that she was participating in the investigation under threat of termination. You'd have to ignore Jean Anderson, Les Nielsen, Patrick Christofferson's testimony that it was required that she testify in front of the board in order to retain her position or to have a chance at retaining her position with Kinnebet County. You'd have to ignore the fact that she wrote, she notified Kinnebet County on December 20th after receiving the notice there would be a board meeting the next day. Quote, I just had surgery. Quote, I'm supposed to be on medical leave. I'm suffering from some physical consequences from this interference with my need for leave and again request that the county postpone the meeting to allow me to use my FMLA leave. You'd have to also ignore the email exchange in which Patrick Christofferson confirms to Ann Gehring, the Kinnebet County attorney, that the board request to give Thompson an opportunity to speak was in fact a board request slash directive. That's at the addendum page 37. The evidence simply doesn't support the contention that these were voluntary activities. Thank you. Thank you. The matter's been well-briefed and well-argued. I want to thank all of you for your time here today. The matter is taken under advisement. You're free to leave. The clerk will call the next case. Great West Casualty Company v. Ruben Decker. One of the lawyers left their binder. I'm okay. Thank you.